CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
GABRIELA RIVERA (Bar No. 283633)
(E-Mail: Gabriela_Rivera@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
CARLITOS RICARDO PARIAS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CARLITOS RICARDO PARIAS,<br><br>　　　　Defendant. | Case No. 2:25-mj-06539-DUTY<br><br>**CARLITOS RICARDO PARIAS'S BRIEF IN SUPPORT OF BAIL** |

Defendant Carlitos Ricardo Parias, by and through his attorney of record, Deputy Federal Public Defender Gabriela Rivera, hereby files this brief in support of his pretrial release.

　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　CUAUHTEMOC ORTEGA
　　　　　　　　　　　　　　　Federal Public Defender

DATED: October 30, 2025　　By: */s/ Gabriela Rivera*
　　　　　　　　　　　　　　　GABRIELA RIVERA
　　　　　　　　　　　　　　　Deputy Federal Public Defender
　　　　　　　　　　　　　　　Attorneys for CARLITOS RICARDO PARIAS

# I. INTRODUCTION

Mr. Parias is a respected citizen journalist who has been recognized by a local lawmaker for his dedication to authentic storytelling and uplifting the unheard voices of his community in South Los Angeles. He is a beloved husband and the father of two U.S. citizen children who he raised in Los Angeles. He has stable employment, a stable residence, and he has no criminal history. He has never been ordered removed from the United States or had any immigration enforcement action taken against him. He has the unwavering support of family and friends, and those who know him best know that he will comply with any terms of his pretrial release.

On October 21, 2025, Mr. Parias left his home and got in his car with the intention of going to work in his role as a citizen journalist. Unbeknownst to Mr. Parias, a group of federal officers were lying in wait, intending to arrest him on a civil, agency-issued administrative warrant. As Mr. Parias attempted to drive away, unmarked cars drove towards him and pinned his car in. The unmarked cars, which look like civilian cars, were driven by heavily armed men who concealed their faces with black coverings and were dressed like civilians. Anyone in Mr. Parias's position would have been overwhelmed and panicked by this terrorizing raid that resembles a kidnapping more than legitimate law enforcement activity. The government alleges that Mr. Parias attempted to dislodge his car and in doing caused smoke and debris from his tires to fill the air. But the Complaint is notable for its glaring omissions. For example, it fails to disclose that the officers drove unmarked cars, covered their faces, and were not in uniform. It fails to acknowledge that officers fired chemical weapons at Mr. Parias. Most critically, the Complaint fails to even allude to the fact that officers shot and wounded Mr. Parias and, as a result, Mr. Parias required surgery and several days' hospitalization. These critical omissions provide ample reason to distrust the prosecution's narrative of events.

Mr. Parias acknowledges that the charges levied against him create a statutory but rebuttable presumption favoring detention. However, he has more than met his

1  burden of production, and the government retains the burden of persuasion with respect
2  to whether conditions can ensure his appearance and the safety of community. He has
3  proposed sureties and he is willing to accept the conditions of pretrial release the Court
4  believes are necessary. These significant conditions are sufficient to mitigate any real
5  risk of flight or danger.

## II. RELEVANT BACKGROUND

Mr. Parias's case occurs against the backdrop of an enormous increase in the presence of federal officers in Los Angeles who have engaged in increasingly dangerous tactics in targeting non-citizens and persons who attempt to record the officers' activities. This background is addressed here because it provides critical context. It shows that officers did not engage in such an aggressive force against Mr. Parias because he was thought to be some particular risk of flight or danger. It also corroborates what has already been publicly reported on regarding Mr. Parias's arrest, much of which the Complaint fails to address at all. Indeed, the government has provided nothing to support its claims about Mr. Parias aside from an affidavit of an officer who was not a percipient witness to the arrest.[1]

### A. Masked, Armed, and Unidentifiable Agents Have Created a Chaotic and Dangerous Environment in Los Angeles and Across the Country

Over the past year, Americans have witnessed a disturbing yet increasingly familiar sight: heavily armed agents conducting immigration arrests have been concealing their faces, identities, and even which agency they work for from the public

---

[1] On October 28, I requested the production of discovery related to the allegations in the Complaint which the government may seek to rely upon at Mr. Parias's detention hearing. For example, the Complaint includes a still image apparently taken from a surveillance camera; I requested the surveillance video. The Complaint alleges that officers had a valid administrative warrant; I requested a copy of the warrant. On October 30, government counsel responded indicating that they do not intend to provide any of the requested material in advance of the hearing.

1  by hiding behind masks, gaiters, balaclavas, hats, and sunglasses.[2] Compounding this
2  problem, officers regularly drive unmarked or camouflaged cars that appear to be
3  civilian cars.[3] Naturally, without seeing an officer's agency designation or any
4  identification, people may not believe that a group of strangers in masks and
5  plainclothes are actually the officers they claim to be. In recognition of the fact that the
6  practice of masked, armed men springing from unmarked cars bears more resemblance
7  to extrajudicial kidnapping than it does to legitimate law enforcement activity, dozens
8  of jurisdictions now seek to ban masking of federal policing authorities in public
9  places.[4]

10  Making matters worse, federal officers have been engaging in increasingly
11  reckless, dangerous tactics. For example, videos showing officers ramming their
12  vehicles into civilian cars and employing aggressive force capable of resulting in injury
13  or death are legion.[5] Similarly, countless videos captured by journalists and the public
14  show immigration officers body-slamming people and indiscriminately deploying
15  chemical weapons such as teargas and pepper balls.[6]

---

[2] Leila Fadel, Masked Immigration Agents are Spurring Fear and Confusion Across the U.S., *Morning Edition,* (NPR Jul. 10, 2025), https://www.npr.org/2025/07/09/nx-s1-5440311/ice-raids-masked-agents#:~:text=%22When%20you%20have%20masks%20on,was%20targeted%20for%20speaking%20up.

[3] *Id.*; *See also* Chiara Eisner and Ximena Bustillo, *Camouflaging Cars and Swapping License Plates: How Agents Make Immigration Arrests*, NPR (Oct. 29, 2025), https://www.npr.org/2025/10/29/g-s1-95373/immigration-arrests-license-plates-conceal-federal-agents

[4] Martin Kaste, *Lawmakers Seek to Ban Federal Agents From Wearing Masks*, NPR (Jul. 25, 2025), https://www.npr.org/2025/07/25/nx-s1-5480219/lawmakers-ban-federal-immigration-agents-masked

[5] Gustavo Arellano, *From L.A to New York, Bumbling, Aggressive ICE is Its Own Worst Enemy*, L.A. TIMES (Oct. 23, 2025), https://www.latimes.com/california/story/2025-10-23/ice-raids-dangerous (Reporting that body camera footage and court records show ICE agents lying about incidents and detaining U.S. citizens, contradicting claims the agency operates professionally)

[6] Siri Chilukuri, *Body Slamming, Teargas and Pepper Balls: Viral Videos Show ICE Using Extreme Force in Chicago*, THE GUARDIAN, (Oct. 4, 2025), https://www.theguardian.com/us-news/2025/oct/04/ice-chicago-extreme-force-protesters-journalists

3

**B.     Federal Agents Have Targeted Journalists and Citizen Journalists Who Have Recorded or Reported on ICE Activity**

Over the last several months, federal agents have endangered and targeted legal observers, journalists, and citizen journalists. Recently, in a lengthy opinion, Judge Hernán Vera of the Central District Court of California determined that "the record includes detailed and credible declarations from nearly 50 journalists, legal observers, and protesters," which showed DHS retaliation against people for protesting against and reporting on the violent immigration raids in Southern California.[7] *Los Angeles Press Club et al., v. Kristi Noem et al.*, 2:25-cv-05563-HDV, Dkt. 55 at 2. The court's ruling includes a preliminary injunction prohibiting DHS from brutalizing journalists, legal observers, and protesters. Unfortunately, Judge Vera's order has not stopped federal officers' ongoing violation of Angelenos' First Amendment rights. To take just one example, just days ago, an ICE officer pointed a firearm at community members who were exercising their First Amendment rights and documenting law enforcement activity.[8]

Abusive practices, misconduct, and a sense of impunity have long existed within ICE and CBP, but the last several months have subjected the people of Los Angeles to an exponential increase in agents' outrageous and shocking conduct. There is no accountability for these officers, not only because it is difficult to identify them but

---

[7] Like other ICE tactics discussed herein, this conduct is hardly limited to the Los Angeles area. For example, journalist Mario Guevara was arrested while livestreaming a protest and was detained for over 100 days in retaliation for his reporting on law enforcement activities. *See, e.g.*, Neil Vigdor, *Journalist Mario Guevara Is Deported After Being Held for Over 100 Days*, N.Y. TIMES, (Oct. 3, 2025), https://www.nytimes.com/2025/10/03/us/mario-guevara-journalist-deported.html

[8] @mrcheckpoint_, ICE Agents Pulls Gxn on Community Members Warning Their Neighbors (Oct. 27, 2025) https://www.instagram.com/reel/DQUYiq2CRvR/

because the DHS has gutted what was already a fragile accountability system at the same time that it is hiring in unprecedented numbers.[9]

### C. Mr. Parias is a Recognized, Respected Citizen Journalist Who Federal Officers Recently Targeted and Physically Abused

Mr. Parias is a well-known and respected citizen journalist in the Spanish-speaking community of South Los Angeles. He has become known for his videos posted on TikTok which document culture and life in Los Angeles. Naturally, as federal police presence increased over the last several months and as the Spanish-speaking community has been hit particularly hard, the focus of his videos has shifted to telling those stories. In August, Councilmember Curren Price's office awarded Mr. Parias with a Certificate of Recognition for his "unwavering commitment to keeping the South Los Angeles community informed, empowered and protected."[10] "Richard is a pillar of our community, a fearless citizen journalist whose authentic storytelling has consistently uplifted the unheard voices of south central Los Angeles," Councilmember Price wrote just last week.[11]

---

[9] Angélica Franganillo Díaz, *Cuts to DHS Watchdogs Spark More Questions as Deportation Efforts Increase*, CNN (Jul. 8, 2025), https://www.cnn.com/2025/07/08/politics/homeland-security-watchdog-cuts

[10] Austin Turner et al., *Depty U.S. Marshal, TikTok Influencer Shot During LA Immigration Operation*, CBS NEWS, (Oct. 21, 2025), https://www.cbsnews.com/losangeles/news/deputy-u-s-marshal-injured-south-los-angeles-shooting/

[11] Curren D. Price, Jr., INSTAGRAM (Oct. 21, 2025) https://www.instagram.com/p/DQFVZTkkj5e/?hl=en

Recently, masked and heavily armed officers encountered Mr. Parias, who was wearing a vest emblazoned with the word "PRESS" across the front, clearly identifying himself as a citizen journalist. The officers physically abused him, and an image from that incident shows Mr. Parias seated on a curb, crying out in pain and clutching his leg as he is surrounded by three heavily armed men, two of whom have their faces entirely concealed. Mr. Parias required immediate medical attention and was taken to a hospital. Perhaps because of their unlawful use of force against him, officers did not follow up or engage in further enforcement action against him.[12]



### D. Mr. Parias Has Deep Ties to the Community, Stable Employment and Residence, and No Criminal History

Like so many other people who have seen their lives upended simply to further arrest and prosecution statistics,[13] Mr. Parias was peacefully going about his life when

---

[12] Ruben Vives et al., *Chaotic Shooting of Suspect and Deputy U.S. Marshal Highlights Increased Aggression in ICE Crackdowns*, L.A. TIMES (Oct. 22, 2025) https://www.latimes.com/california/story/2025-10-22/tiktok-streamer-ice-arrest (Describing a video from June of this year that shows Mr. Parias writhing in pain and holding his leg and "Agents later let him hobble away . . . .")

[13] Fox News, "Stephen Miller Reveals Trump Admin's 'Daily Goal' for Illegal Migrant Arrests," YouTube, May 29, 2025. Available at: https://www.youtube.com/watch?v=MJNXsOqFSZs ("Under President Trump's leadership we're looking to set a goal of a minimum of 3,000 arrests for ICE every day

officers targeted him last week. As reflected in the PSA report, he has lived in the community for years. He is an active and attentive father to two U.S. citizen children. He has stable employment and is a well-regarded citizen journalist. He has no criminal history and no history of immigration-related enforcement.

E.   **Public Accounts Show Masked, Unidentifiable Officers in Unmarked Cars Shot and Wounded Mr. Parias, None of Which is Even Acknowledged in the Complaint**

Public accounts of Mr. Parias's arrest reveal critical information the government failed to disclose in the Complaint.[14] For example, the Complaint fails to acknowledge that federal officers drove unmarked cars that appear to be civilian cars, covered their faces with masks and low-fitted caps, and many appear to be dressed in plainclothes such as jeans. Thus, they stand in stark contrast to the LAPD officers who arrived on scene later and are easily identifiable as law enforcement because they are in uniform and not concealing their faces.



---

and President Trump is going to keep pushing to get that number up higher each and every single day.")

[14] The Complaint includes a still image apparently taken from a surveillance video, but the government has refused to provide that video to the defense.

7

The Complaint details that Mr. Parias allegedly accelerated his car toward a law enforcement car and that this caused the agents to fear Mr. Parias would somehow dislodge his vehicle and injure them. The Complaint ends abruptly there. It fails to address that Mr. Parias could not dislodge his car given that it was completely boxed in and the tires were shredded. Most significantly, it fails to even acknowledge that officers trained their weapons on Mr. Parias and at least one officer fired shots directly at him, striking him, wounding him, and requiring that he undergo surgery and remain in the hospital for several days.

Finally, it's worth noting that while the Complaint states that Mr. Parias "was the subject of an administrative arrest warrant issued in conduction with a federal immigration proceeding," these administrative arrest warrants are not issued by a judge and are instead signed by the agency itself. Put differently, no neutral, independent judge made any determination that arresting Mr. Parias, rather than providing him with a Notice to Appear in immigration court, was necessary for public safety.

### III. ARGUMENT

"Bail is . . . basic to our system of law," *Schilb v. Kuebel*, 404 U.S. 357, 365 (1971), and "[i]n our society, liberty is the norm, [while] detention prior to trial" is "the . . . limited exception," *United States v. Salerno*, 481 U.S. 739, 755 (1987). "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). Recognizing this, "federal law has traditionally provided that a person arrested for a noncapital offense shall be admitted to bail," that only "in rare circumstances should release be denied," and that all "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). The Bail Reform Act ("Act") embodies these principles, strongly favoring release over pretrial detention. *See United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972) ("The whole spirit of the [Act]

is that a defendant . . . should be released, rather than detained, unless there are strong reasons for not releasing him") (describing former version of the Act).

## A. The Government Has the Burden to Prove by Clear and Convincing Evidence that Mr. Parias Poses a Risk of Flight or Danger That Cannot Be Mitigated by Conditions of Release

The charges against Mr. Parias create a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3). This rebuttable presumption, however, merely shifts the burden of *production* to the defendant; the ultimate burden of *persuasion* remains with the government. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). A finding that a defendant is a danger to any other person or the community must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(B).

## B. Because the Government Cannot Meet Its Burden, the Court Should Fashion Conditions of Release

The Court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense, (2) the weight of the evidence, (3) the history and characteristics of the person (including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, or record concerning appearance at court proceedings), and (4) the nature and seriousness of the danger to any person or the community posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985). Significantly, the Ninth Circuit has held that the weight of the evidence should be treated as the least important factor. This guards against the possibility of making a "preliminary determination of guilt" that then leads to punishment in the form of a refusal to grant release. *Motamedi*, 767 F.2d at

9

1408. "The factor may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id*.

### 1. Mr. Parias is Not a Risk of Non-Appearance

Mr. Parias's deep ties to the Los Angeles community strongly cut against any finding that he is a flight risk. He has lived in the Los Angeles area for years, has raised his U.S. citizen children here, and is a respected member of the community and citizen press here. Describing Mr. Parias recently, Councilmember Price wrote that, "Richard is a pillar of our community, a fearless citizen journalist whose authentic storytelling has consistently uplifted the unheard voices of South Central Los Angeles."[15] Mr. Parias has made his life here in Los Angeles and has contributed enormously to the community here. He has also worked tirelessly to provide for his family, including his son who is a proposed surety. There is simply no reason to believe that he would now jeopardize their financial stability by failing to appear for a hearing.

### 2. Mr. Parias Does Not Pose a Danger to the Community

As addressed above, Mr. Parias has been recognized for his contributions to the community of South Los Angeles. While the charges levied against him are serious, the Court must also consider his character, family and community ties, financial resources, lack of criminal history, lack of substance abuse, and lack of prior failures to appear. Mr. Parias submits that these factors, taken together and in conjunction with the conditions he proposes, sufficiently mitigate any real or perceived risk of future danger to the community.

### 3. There Are Conditions that Can Ensure Mr. Parias's Appearance and the Safety of the Community

If the government does not meet its burden, the Court must fashion appropriate conditions that permit Mr. Parias to remain out of custody during the preparation of his

---

[15] Curren D. Price, Jr., INSTAGRAM (Oct. 21, 2025) https://www.instagram.com/p/DQFVZTkkj5e/?hl=en

defense while safeguarding against flight or danger to the community. Close cases should result in release: "[t]o give effect to the principle that doubts regarding the propriety of release be resolved in favor of the defendant, the court is to rule against detention in close cases." *United States v. Chen*, 820 F.Supp. 1205, 1208 (N.D. Cal. 1992) (Walker, J.) (citing *Motamedi*, 767 F.2d at 1405–06).

There are conditions that the Court could impose to ensure Mr. Parias's appearance and the safety of the community, and Mr. Parias is prepared to embrace them. With respect to the type of bond, Mr. Parias proposes that the Court order his release upon the submission of two affidavits of surety without justification each in the amount of $5,000 and a cash deposit in the amount of $5,000. To minimize the risks of flight or danger to the community, the Court can impose conditions including the surrender of all travel documents, residential restrictions, and restrictions related to witnesses all in addition to the financial package that Mr. Parias has proposed.

## IV. CONCLUSION

For the foregoing reasons, Mr. Parias respectfully requests that this Court order him released under conditions.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: October 30, 2025       By: */s/ Gabriela Rivera*
                              GABRIELA RIVERA
                              Deputy Federal Public Defender
                              Attorneys for CARLITOS RICARDO PARIAS

11