10:04:47

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
HONORABLE FERNANDO M. OLGUIN, U.S. DISTRICT JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>CARLITOS RICARDO PARIAS,<br>Defendant. | 2:25-CR-904-FMO |

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California
Tuesday, December 9, 2025

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here: www.amydiazfedreporter.com*

APPEARANCES OF COUNSEL:

For the Plaintiff:

Office of the United States Attorney
By: Kali Yallourakis,
Assistant United States Attorney
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

For the Defendant:

OFFICE OF THE FEDERAL PUBLIC DEFENDER
By: Cuauhtemoc Ortega,
Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012

10:04:47 THE CLERK: Calling item number one CR-25-00904 United States of America vs. Carlitos Ricardo Parias.

10:04:56 Will counsel please make their appearances?

10:04:58 MS. YALLOURAKIS: Good morning, Your Honor. Kali Yallourakis on behalf of the United States.

10:05:02 THE COURT: Good morning.

10:05:04 MR. ORTEGA: Good morning, Your Honor. Cuauhtemoc Ortega on behalf of Carlitos Ricardo Parias, who is present in custody, being assisted by a Spanish language interpreter.

10:05:12 THE COURT: I'll ask the interpreter to please state his name for the record.

10:05:16 THE INTERPRETER: Jesus Rivera, Spanish interpreter. Oath is on file.

10:05:20 THE COURT: Why don't we get started. We are here for a bail review. Let's -- let me start with the Government. Can you pronounce your last name?

10:05:36 MS. YALLOURAKIS: Sure. Yallourakis.

10:05:38 THE COURT: Yallourakis, okay.

10:05:39 And so why don't -- oh, is Pretrial here? Sorry. Introduce yourself.

10:05:48 MR. TANEDO: Good morning, Your Honor. Jarryd Tanedo Probation Pretrial.

10:05:51 THE COURT: Okay. So we are here on a bail review.

10:05:57 Ms. Yallourakis, I guess you haven't been on the case very long. Is that correct?

MS. YALLOURAKIS: That's correct, Your Honor. I was the AUSA who charged it, but then had passed it off to Chris Jones, who is at the --

THE COURT: Training. Okay.

Well, why don't we get started. Everything has been taken care of with respect to the underlying bail conditions.

Since it is the Government's bail review motion, why don't I start with you.

Before I start, though, I just wanted to note, or wanted to ask how long you have been with the office, and do you know who Judge Chooljian is?

MS. YALLOURAKIS: I do, Your Honor. I have been with the office about a year and a month. I haven't appeared in front of Judge Chooljian for magistrate duty a whole lot. She hasn't happened to be on duty when I have been on duty.

THE COURT: You know, she worked in your office for almost 30 years.

MS. YALLOURAKIS: I'm aware of her history.

THE COURT: She was the Chief of the Criminal Division, right?

MS. YALLOURAKIS: Yes, Your Honor. I'm aware of her history with the office, but in terms of frequency in appearing in front of her.

THE COURT: I'm just saying, as I made the observation last week, I find it -- it's just unusual that

10:07:22 I'm getting a bail review from her, because she, how shall we put it? She's less likely than most magistrate judges to give bail.

So anyway, but I'm a little surprised that you guys are -- there is probably no magistrate judge who has worked -- well, maybe Judge Sagar -- who has worked for the U.S. Attorneys longer than her. So I'm just a little surprised that you guys are appealing her order, knowing that she knows your office far better than you do as far as that goes.

MS. YALLOURAKIS: Absolutely.

THE COURT: But go ahead. It's your motion. Tell me how Judge Chooljian got this wrong.

MS. YALLOURAKIS: Thank you, Your Honor.

We've obviously submitted our brief. We've had argument on this issue before. The fundamental arguments haven't changed, so I won't --

THE COURT: Okay. Okay.

MS. YALLOURAKIS: -- I won't repeat them for you. We'll just go ahead and submit.

THE COURT: Submit on that. Okay. I appreciate that.

Mr. -- and it's unusual that the actual Federal Public Defender is here himself. I understand -- where is Ms. Rivas today?

10:08:39 MR. ORTEGA: Unfortunately, we made a calendaring error. She's at the Criminal Duty court, but I'm happy to stand in.

10:08:47 THE COURT: That is fine. I know the U.S. Attorneys, your past U.S. Attorneys, have often kept a few cases anyway. I think -- I know Ms. Potashner always had a few of her own cases. I know you don't have a lot of time to litigate in your position.

10:09:04 MR. ORTEGA: We are pretty understaffed.

10:09:06 THE COURT: No, I can imagine.

10:09:07 So well, I mean, I will tell you, because if this will affect anything, I think I've already telegraphed my tentative, but so you know, my tentative was to -- obviously, to uphold the magistrate judge's decision.

10:09:23 I did do -- I did do a de novo review. I reviewed everything. But so having heard that, go ahead and tell me what you want to say.

10:09:35 MR. ORTEGA: If that's the case, Your Honor, I don't need to add anything.

10:09:37 THE COURT: Are you sure at that point?

10:09:39 MR. ORTEGA: Yes, Your Honor. I guess I'll just briefly state that although we just got the remainder of the discovery Friday night, what we were able to review last week from earlier productions I think just supports Judge Chooljian's decision.

I mean, what you see in the October incident is agents swarming Mr. Parias's car. There is some movement of Mr. Parias's car, but there is nothing to justify the reckless shooting by this ICE agent with the intent to kill him, with other law enforcement officers standing behind him in the line of fire. It was a complete overreaction, that I think will be addressed in other motions work.

But, you know, I guess that's the only thing I would add, only because I think it supports Judge Chooljian's instinct about this case.

THE COURT: Okay. Let me ask government counsel, did you want to say anything in response? Otherwise, I can give my ruling for the record at this point.

MS. YALLOURAKIS: No, Your Honor. Thank you.

THE COURT: Okay. So I'm first going to start with the long-held principle noted by the Supreme Court in *United States v. Solarno* that in our society, liberty is the norm, and detention prior to trial is the carefully limited exception.

In other words, federal law has traditionally provided that a person arrested for a non-capital offense shall be admitted to bail, and then only in rare cases should release be denied.

Under the Bail Reform Act, bail is denied only when the Court finds that no condition, or combination of

conditions, will reasonably assure the appearance of the person as required, and the safety of any other person in the community.

Here, the Government sought detention pursuant to 18 USC Section 3142(f)(2)(A). That is because this is allegedly a case involving a serious risk that defendant will flee under the circumstances; and therefore, the Court must determine whether there are conditions that will reasonably assure the appearance of defendant as required, and the safety of others in the community.

In conducting this inquiry, the Court considers the nature and circumstances of the offense, the weight of the evidence against defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by defendant's release.

The weight afforded to each factor is within the province of the Court; however, the Ninth Circuit has held that the weight of evidence against a defendant is the least important of the various factors.

Based on the charge here, no presumption applies, and the Government's typical burden remains -- the Government's typical burdens remain in place.

That is, the Government must overcome the presumption of release by showing with clear and convincing

evidence that no condition, or combination of conditions, can reasonably assure the safety of the community, or by a preponderance of the evidence that no condition, or combination of conditions, can reasonably assure the defendant's appearance.

The Court will consider the first two factors: The nature and circumstances of the offense, and the weight of the evidence together.

The Government has produced evidence in the form of the charging documents, and apparently has surveillance video which this Court has not been able to review, the weight of the evidence neither seems overwhelming, nor underwhelming at this stage.

As to dangerousness, although the defendant faces serious charges, the Court finds that the facts surrounding the moment of defendant's arrest do not evince dangerousness by clear and convincing evidence.

For example, the affidavit attached to the initial complaint suggests that while officers were afraid that defendant might lose control of his vehicle and accidentally strike someone as he attempted to flee, the Court has seen no suggestion that officers feared that defendant had the specific intent to striking officers with his vehicle.

I'll also note, in light of what defense counsel just stated, I haven't even seen that, so it sounds from what

he's saying that it is -- that it supports the decision, or what I'm saying even more so if I had seen what you reviewed, the discovery.

This is unlike a similar case in the Eastern District of Washington called United States vs. Mercado where the Court found that the nature of the similar assault charges supported a risk of dangerousness finding. However, in that case, the defendant had allegedly closed the window of his car on the arm of an agent, pinning the agent's arm as the defendant attempted to evade arrest. That kind of intent to make physical conduct with an officer is lacking here.

Moving on to the next factor the Court will consider, the defendant's history and characteristics, the Court finds that these factors weigh strongly against a finding of dangerousness or risk of nonappearance; and therefore, weigh in favor of defendant.

According to the information presented in the Pretrial Service report and by the parties, defendant is 44 years old, and is a Mexican citizen. However, he has lived in the United States for 22 of those years, which is half his life, and the vast majority of his adult life.

His parents are deceased. And while he has one sister in Mexico, his two brothers also live in the United States. He has been married to his wife, Ms. Hernandez, for the past 20 years, and they have two United States citizen

children.

He has lived at the home at his -- the same home in Los Angeles for 15 years. He has no firearms in his home, no substance abuse history, and no prior convictions. He has maintained stable employment in both construction and in his current work as a local Internet journalist.

Both parties discuss an incident that occurred in June 2025 when defendant was stopped by law enforcement, apparently injured during the stop, handcuffed and left to sit on the sidewalk.

Although there appears to be some dispute around whether defendant was whisked away by onlookers or left of his own volition, what seems clear is that he was taken to the hospital for treatment of the injuries he sustained during the encounter with law enforcement.

Considering all of these characteristics together, the Court reiterates that these factors strongly supports defendant: The fact that defendant has spent nearly his entire adult life in the United States, has lived in the district for over a decade, has maintained steady employment in this district, and has immediate family in this district, including his wife and children, all cut in his favor, and outweigh the fact that he formerly lived in Mexico.

Although the June 2025 incident could be seen as creating a discrete source of concern, it is unclear whether

10:17:29 the defendant left of his own accord or was whisked away, as 10:17:36 the Government described it in the hearing before Judge 10:17:38 Chooljian; therefore, this incident is of limited value, and 10:17:42 does not outweigh defendant's favorable characteristics.

10:17:45 In sum, considering defendant's lack of any prior 10:17:50 convictions, absence of substance abuse history, extensive 10:17:55 family ties to the district, his stable employment history in 10:17:58 this district, his bond resources, all collectively weigh 10:18:03 against a finding of dangerous or nonappearance, and 10:18:09 specifically outweigh any concerns relating to the June 2025 10:18:13 incident.

10:18:15 Under the circumstances, then, the Court finds -- 10:18:21 the Court agrees and upholds Judge Chooljian's findings that 10:18:25 there are conditions, or combination of conditions that can 10:18:30 be imposed that will reasonably assure defendant's appearance 10:18:34 in court.

10:18:36 And so for that reason, the Government's application 10:18:42 for review and reconsideration of Judge Chooljian's release 10:18:47 order is denied.

10:18:48 And again, I find that the conditions are sufficient 10:18:52 to reasonably assure defendant's appearance in this case.

10:18:56 Let me ask defense counsel -- I mean government 10:19:00 counsel, so the bail issue, I mean, in some ways, because 10:19:06 he's now in ICE custody, but I -- based on my review of the 10:19:12 Government's request for detention, and the transcript of the

detention hearing held before Judge Chooljian, it does not appear that the Government availed itself of the temporary 10-day detention authorized by Section 3142(d) to allow the relevant immigration officials to detain defendant if the Government agencies decided to proceed with deportation rather than prosecution.

I was -- why didn't the Government ask Judge Chooljian to make the relevant findings under Section 3142(d) to trigger the 10-day detention period?

MS. YALLOURAKIS: I'm not really sure, Your Honor.

As I understand the proceedings, Judge Chooljian ordered bond contingent on the satisfaction partially of the sureties, but partially of putting up the cash.

My understanding of why defendant was never transferred from federal to immigration custody, such that the detainer would be executed, was because he didn't satisfy that cash condition.

THE COURT: Okay.

MS. YALLOURAKIS: And so my best understanding of it is that there was already a release order, there was already a detainer, and so the sort of transfer, if defendant would have satisfied those conditions, would have been not automatic, but somewhat contemporaneous.

So that is my understanding of why we didn't feel it was necessary to seek the 10-day stay.

THE COURT: Okay. So but now that he is in ICE detention -- I mean, so what is going to happen after today?

So my view is that he should now be released, but is it the Government's position that he is going to remain in ICE custody through trial -- to get, you know, through trial, or what is going to happen?

Because you are correct that last week when we showed up for court, and getting ready for court, I realized that one of the conditions of the bond hadn't been satisfied, and that is why we are here today.

But, you know, I'm a little concerned that defendant's -- one of the things they raised last week, and it's in their papers, is their ability to meet with their client to prepare for trial. And it's coming up soon.

So what is -- what is the Government's position at this point? Is he going to -- is he going to be released from ICE custody at this point? Because if he's not, then we -- that raises other issues, right?

MS. YALLOURAKIS: Sure, Your Honor.

So my understanding of the situation is that ICE has a detainer on him. And so if he is granted -- you know, now that he has been granted bond, he is out of federal --

THE COURT: Yeah.

MS. YALLOURAKIS: -- detention, and in Immigration custody. That is, of course, a separate agency outside of

our purview. So what they choose to do is not our decision, obviously.

THE COURT: Yeah.

MS. YALLOURAKIS: I understand that people see it differently in terms of agency collaboration.

So sort of setting that aside, though, there was something else I was going to say that I have now forgotten my train of thought.

THE COURT: I do that all the time.

MS. YALLOURAKIS: I'm sorry. And you asked about access, I believe.

THE COURT: Exactly. Because there is a serious -- well, yeah, go ahead.

MS. YALLOURAKIS: Thank you.

So the thought on that is, you know, we don't dispute that Adelanto is far, and that access is more difficult than if Mr. Parias was being housed in MDC. Obviously, with the Court's order of bond, Adelanto is where defendant would return.

I don't know if there is a way in which essentially detention can be granted, such that defendant is then transferred back to MDC, which would alleviate the access issue a little bit, would be my only suggestion really.

But, you know -- so I don't know if there is a way the Court can fashion either conditions, or reverse, you

10:23:35 know, sort of reverse its ruling, but sort of have the reasons still stand on the record. But that is the only thing I can really think of in terms of alleviating the access issue, because we do not dispute that access is more difficult at Adelanto than MDC.

10:23:51 But in terms of sort of our position on whether he should be released or not, again, we litigate bond or detention, and then once that is settled, it's a little bit out of our purview what is done with the detainer.

10:24:05 So I don't know if that is helpful to Your Honor at all.

10:24:08 THE COURT: Let me see what defense counsel has to say.

10:24:12 MR. ORTEGA: Well, Your Honor, I don't think it's appropriate to order him detained just for the sake of allowing pretrial preparation.

10:24:24 I think once now two judicial officers have decided that the Bail Reform Act requires his release with conditions, that is that. I don't think we reverse that because the Government -- and I understand the distinction -- the distinction counsel is making between the agencies, but at the end of the day, it's still an executive branch decision to hold him in a remote location.

10:24:50 And our efforts to communicate with him have been pretty frustrated in the last two weeks. We estimate that it

takes, you know, two to three hours each way to go see him. The visiting hours are between 8 and 3:30, so it's not the case, such as with MDC, where it's open not just the whole business day, but a few hours after the business day. It's not open on weekends.

There is a process by which you can make an appointment, but we haven't been successful at making an appointment. And, in fact, when we have called the Adelanto detention facility, the person who answers the phone tells us that the appointment scheduler, whose name is Agent Camargo, that she's received a lot of complaints that Ms. Camargo has not been returning calls or scheduling legal visits. And her recommendation to us was to just keep leaving voicemails that hopefully will be responded to at some point.

THE COURT: Let me ask you this: Why not just file -- and I can set a briefing schedule today -- why not just file -- and I would do it via ex parte, because the trial is coming up -- file an ex parte to dismiss the Indictment, because, you know, defendant's continued immigration detention has jeopardized his constitutional and statutory rights to counsel because he's suffered undue hardship and inconvenience, and that he has been denied the ability to meet with his attorney, prepare for trial.

I have seen cases where other judges do that. It sounds like Adelanto is, you know -- in fact, in one of the

10:26:38 cases that I saw, the distance was much closer than Adelanto is to you guys.

10:26:43 Why not just file that then?

10:26:46 MR. ORTEGA: Your Honor, I think that is what we are going to do. I think, just to be candid with the Court, what we were trying to do is make a good faith effort to figure out logistically if it was possible to see him. And now that, you know, a couple of weeks have passed, it's concretely shown to us that it's just not going to be possible to prepare for trial with him that far away from us.

10:27:07 THE COURT: Well, why don't I set a briefing schedule right now, and do it via ex parte, you know, or expedited motion, whatever you want to call it. An application and a motion are the same thing except the timing. When people hear "ex parte," at least in the civil context -- I think you guys view it differently in the criminal -- but in the civil context, an ex parte just means it's a motion that is ruled on quickly, or the briefing is quicker.

10:27:36 Because I'm a little concerned, I get -- I see that the Government -- I hear what the Government is saying about the potential suggestion, but I agree with you that that -- what is the purpose of the Bail Reform Act if he's still in custody?

10:27:53 And it's the -- it's the executive branch. And the

10:27:58 way I have always understood it is that they are in custody
10:28:01 with ICE for purposes of removal, and they are in the
10:28:08 Marshal's custody for purposes of prosecution. And you can't
10:28:11 sort of flout, you know, flout that by doing it this way.
10:28:15 So why don't you do -- let's see, today is Tuesday.
10:28:24 I'll give you until Friday to do the ex parte.
10:28:27 MR. ORTEGA: I can do it sooner, Your Honor.
10:28:28 THE COURT: Well, and then I'll give the Government
10:28:38 until Monday to do the opposition, and give you until
10:28:40 Wednesday to do the reply.
10:28:41 Because I'm just really concerned about this. And
10:28:51 I'm not really sure what is going on here, but -- and I don't
10:28:58 know why, you know -- I was trying to get -- I was hoping the
10:29:08 Government would tell me that, yes, they will get him
10:29:10 released. And then he'll be released, and then you will be
10:29:14 able to meet with him to prepare for trial, but it's pretty
10:29:18 clear that that is not happening here.
10:29:21 MR. ORTEGA: Your Honor, may I?
10:29:22 THE COURT: Yeah.
10:29:23 MR. ORTEGA: May I suggest --
10:29:24 THE COURT: Go ahead.
10:29:25 MR. ORTEGA: -- advancing the briefing schedule
10:29:26 where we would file our ex parte application tomorrow?
10:29:29 THE COURT: That is fine. And then the opposition
10:29:30 by Friday, because I was --

MR. ORTEGA: Yes.

THE COURT: And then the opposition by Friday, and then the reply by Monday. And then we'll go from there.

And in the meanwhile, the -- I will want -- I mean, we have to deal with the ex parte, and also assume we are going to trial. So we are kind of going on two tracks here. Because I don't know how it's all going to shake out until I read the briefing.

But I am going to want by Friday from the government counsel -- and let me ask government counsel, are you the lead counsel, or is it, I forget his name, Mr. Jones?

MS. YALLOURAKIS: It's Mr. Jones, Your Honor. I'm just filling in while he's out of state.

THE COURT: Okay. So then I guess -- when does he get back?

MS. YALLOURAKIS: Let me look. I believe he gets back this Friday, Your Honor.

THE COURT: Okay. So I guess I'll set the deadline for Monday for him to give me -- I'm going to want a declaration. Now, this relates to the trial, just in case, depending on how I rule on the ex parte, from him under penalty of perjury, signed by him, that sets forth the names and titles of the individuals of every individual who conducted the *Brady*, *Henthorn* and *Giglio* reviews, and the dates on which such reviews were conducted.

I do want to caution Mr. -- the government counsel that failure to provide such a declaration may lead to the imposition of sanctions.

And then the last thing -- anything else? I'm pretty much done at this point.

MR. ORTEGA: The only thing we would request, if Your Honor is inclined, the discovery deadline was on Friday. And we have been able to review some of the videos, and we may be wrong about this, but it seems like some of the videos are excerpts, rather than the full videos.

So if we could ask the Government to ensure that we have the full videos.

THE COURT: Can you do that, ensure that they have the full videos, and give it to them today by the end of the day?

MS. YALLOURAKIS: Yes, Your Honor. I believe at least one video that defense counsel is referring to is an aerial view. And I think that there was some thought by them that that was an excerpt. We have confirmed that that is the entire video, so you do have that.

THE COURT: Well, I want that in a declaration under penalty of perjury. So either you or Mr. Jones will have to give that as a declaration, as well.

Now, you do know, right, that under my -- under my discovery order deadline, the Government can't introduce any

evidence at trial that wasn't provided to defense counsel prior to the discovery cutoff.

Anything else, then, counsel? I think we are done here today.

MR. ORTEGA: No, Your Honor.

THE COURT: Actually, one last point. So if any deadlines have passed, or are about to pass, and you guys don't meet the deadlines, don't bother submitting late stuff, because it will just be stricken, okay?

And other than, you know, what I said here, as far as -- other than like the ex parte and things like that, which is a different issue, it doesn't really relate to the trial at all.

And everything is still set. I'm not changing anything at this time. The dates are set.

I will decide after I see the ex parte briefing whether I need a hearing. I may do it on the papers, and I may not. I mean, I feel like I've heard enough from the two of you here to deal with that, to deal with that issue on the papers, but if for some reason something comes up and I decide I want an oral argument, I'll send an order out right away and get you guys in here, okay?

MR. ORTEGA: Yes, Your Honor.

THE COURT: Anything else, counsel? Anything else? No?

MS. YALLOURAKIS: Just one clarification.

THE COURT: Sure.

MS. YALLOURAKIS: In terms of the video that -- the discovery issue, do you want that in the same declaration as the *Henthorn* declaration?

THE COURT: No. I think that should be sooner, because it's discovery. And it would have been -- I know you produced it last week by the -- I think sometime last week was the discovery cutoff. But I think that if -- you should get it to him by tomorrow, by tomorrow, because even Mr. Jones can do, you know, from -- it's, you know, nowadays -- I remember, you know -- this is a problem when you have been in front of a judge who has been around a long time -- I remember way back when when I was a lawyer and fax was the only thing we did, I remember being back East, and having to find a fax machine that was -- and, yeah, and faxing declarations for stuff I was working on.

MS. YALLOURAKIS: Sorry, Your Honor. And I may be -- so a declaration from Chris tomorrow to defense counsel indicating --

THE COURT: No, to the Court, to me, to me, but it can be --

MS. YALLOURAKIS: Okay.

THE COURT: And that he's provided everything -- that it's not an excerpt, it's the actual video, the real

video.

And what else, Mr. Ortega?

MR. ORTEGA: That was it, Your Honor.

And just to respond to counsel's point, that was not the video we were referring to. So if you can just check the videos.

THE COURT: Check on all the videos, and then check all the videos. But before you leave today, maybe you might want to be as specific as you can, but have him address all the videos, that they are all accurate, complete copies of all the videos.

But Mr. Ortega will let you know which one is the -- which ones he's particularly concerned about.

Anything else then?

MS. YALLOURAKIS: Thank you.

MR. ORTEGA: No, Your Honor.

THE COURT: Thank you all.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

----------------------------

Amy C. Diaz, RPR, CRR December 31, 2025

S/ Amy Diaz